TM:EAG/JDG
F.#2010R00223

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# M-10-130

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

SEBASTIANO SARACINO,
    also known as "Sebby" and
    "Sebastian Saracino,"

           Defendant.

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT
(T. 18, U.S.C., § 1425(a))

- - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        FRANK IERVASI, being duly sworn, deposes and says that
he is a Special Agent with Immigration and Customs Enforcement,
duly appointed according to law and acting as such.

        Upon information and belief, on or about January 3,
2002, within the Eastern District of New York and elsewhere, the
defendant SEBASTIANO SARACINO, also known as "Sebby" and
"Sebastian Saracino," did knowingly and intentionally attempt to
procure, contrary to law, naturalization, in that the defendant
knowingly and intentionally made false statements under oath, in
a case, proceeding and matter relating to naturalization and
citizenship, falsely stating that he (1) had not knowingly
committed a crime for which he had not been arrested and (2) did

not belong to and was not affiliated with any organizations, associations or society, in violation of Title 18, United States Code, Section 1015(a).

(Title 18, United States Code, Sections 1425(a) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1.     I have been a Special Agent with the Bureau of Immigration and Customs Enforcement ("ICE") for approximately four years.  During my tenure with ICE, I have been involved in various criminal investigations of the enforcement of U.S. immigration and customs laws.  These investigations have included, among other investigative techniques, the use of physical and electronic surveillance, execution of search warrants, consensual recordings and debriefing of confidential sources.  Through my training, education and experience, I have become familiar with organized crime activities, including illegal activities involving different forms of illegal gambling, loansharking and extortion, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.     I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) information obtained from other law enforcement agents, (c) information obtained from

2

the Department of Homeland Security, United States Citizenship and Immigration Services ("CIS"), and (d) public records. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant SEBASTIANO SARACINO, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest.

THE COLOMBO ORGANIZED CRIME FAMILY

3.     Based on debriefing cooperating witnesses and confidential informants, reviewing electronic surveillance and consensual recordings, speaking with other law enforcement agents, and reviewing documentary and physical evidence, I am aware of the following facts, among other facts, about the Colombo organized crime family of La Cosa Nostra (the "Colombo family"). The Colombo family, including its members and associates, constitute an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, that engaged in, and the activities of which affect interstate and foreign commerce. The enterprise constitutes an ongoing organization whose members

3

function as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The Colombo family operates in the Eastern District of New York and elsewhere.

4.      The Colombo family is part of a nationwide criminal organization known by various names, including the "mafia" and "La Cosa Nostra," which operates through entities known as "families."  The ruling body of this nationwide organization is known as the "Commission," the membership of which at various times has included the bosses of the five New York City-based families, to wit: the Bonanno, Colombo, Gambino, Genovese and Luchese organized crime families.

5.      From time to time, the Colombo family would propose a list of associates to be "made," that is, to become members of the Colombo family.  The list would be circulated to the other families based in New York City.

6.      The Colombo family consists of groups of individuals headed by "captains," who are also referred to as "skippers," "caporegimes" and "capodecinas."  These groups, which are referred to as "crews," are comprised of "made" members of the Colombo family, who are referred to as "soldiers," "friends of ours," "good fellows" and "buttons," and associates of the Colombo family.  Certain crew members maintain their own crew of associates to assist them in carrying out their criminal activity.

4

7.     Above the captains are the three highest-ranking members of the Colombo family, collectively referred to as the administration.  The head of the Colombo family, who is known as the "boss," is assisted by an "underboss" and a counselor, who is known as the "consigliere."  With the assistance of the underboss and consigliere, the boss is responsible for setting policy, resolving disputes between members of the Colombo family and members of other criminal organizations, and approving significant actions by members of the Colombo family.  When a member of the administration is unable to fulfill his criminal responsibilities another member of the Colombo family is often appointed to that position in an acting capacity.

8.     The boss, underboss and consigliere of the Colombo family supervise, support, protect and discipline the captains, soldiers and associates and receive reports regarding the activities of the members and associates of the Colombo family.  In return for their supervision and protection, the boss, underboss and consigliere receive part of the illegal earnings of each crew.

9.     The Colombo family, through its members and associates, engages in racketeering activity as defined in Title 18, United States Code, Section 1961(1), consisting of acts involving violations of state law to include but not limited to, murder, and violations of federal law to include, but not limited

5

to, murder, robbery, extortion, loansharking, and illegal
gambling.

### DEFENDANT'S AFFILIATION WITH THE COLOMBO FAMILY

10.    An individual who was an inducted member of the
Colombo family (hereinafter, "CW-1")[1] is cooperating with the
government.  The information provided by CW-1 regarding Colombo
family activities in New York has been corroborated in numerous
ways, including other confidential sources, cooperating
witnesses, consensual recordings and other physical evidence.

11.    An individual associated with the Colombo
family (hereinafter, "CW-2")[2] is also cooperating with the
government.  Among other things, CW-2, at the direction of the
FBI, has consensually recorded meetings with members and
associates of the Colombo family.  The information provided by
CW-2 regarding Colombo family activities in New York has been

---

[1]    CW-1 has pleaded guilty, pursuant to a cooperation
agreement with the United States Attorney's Office for the
Eastern District of New York, to racketeering conspiracy and
three counts of murder in aid of racketeering.  In exchange for
his cooperation, CW-1 is hoping to receive leniency at sentencing
and admission into the Witness Security program.

[2]    CW-2 has pleaded guilty, pursuant to a cooperation
agreement with the District Attorney's Office for New York
County, to Criminal Possession of a Controlled Substance in the
Third Degree, in violation of New York Penal Law § 220.16, a
Class B felony.  In addition, CW-2 has pleaded guilty, pursuant
to a separate cooperation agreement with the United States
Attorney's Office, to racketeering conspiracy, with predicate
acts of illegal gambling and distribution of marijuana.   In
exchange for his cooperation, CW-2 is hoping to receive leniency
at sentencing and admission into the Witness Security program.

6

corroborated in numerous ways, including other confidential sources and the consensual recordings made by CW-2 with members and associates of the Colombo family.

12.     According to CW-1 and CW-2, the defendant SEBASTIANO SARACINO has been an associate of the Colombo family since the early 1990s.

13.     In or about December 2003, a cooperating witness (hereinafter, "CW-3"),[3] who was an inducted member of the Bonanno family, provided Special Agents with the FBI with a slip of paper, which had been provided to him, which had been circulated among the various New York area organized crime families, identifying certain Colombo family associates being proposed for membership in organized crime.  The list includes, among others, "dino saracino (lil d)," "joe compitello [sic] (joe cave)," the defendant "sebastain saracino [sic]," "michaelangelo souza," and "graig [sic] marino (lil graig)."

14.     CW-1 advised that in or about 2004, CW-1 was formally inducted into the Colombo family at a residence located on West 6th Street in Sheepshead Bay, New York.  CW-1 further advised that the defendant SEBASTIANO SARACINO, as well as

---

[3]     CW-3 has pleaded guilty, pursuant to a cooperation agreement with the United States Attorney's Office for the Eastern District of New York, to racketeering conspiracy, including, among other crimes, two murders as predicates acts. In exchange for his cooperation, CW-3 is hoping to receive leniency at sentencing and admission into the Witness Security program.

7

individuals by the names of Dino Saracino and Craig Marino, were also inducted into the Colombo family on that day.

### SARACINO HAS COMMITTED CRIMES FOR THE COLOMBO CRIME FAMILY

I.    August 1996 Arson and Insurance Fraud

15.    As further described below, the defendant SEBASTIANO SARACINO, together with others, participated in an arson of 2555 Stillwell Avenue, Brooklyn, New York (hereinafter, "the Property") and related crimes, in violation of Title 18, United States Code, Section 1341 (Fraud) and New York Penal Law § 150.10 (Arson in the Third Degree).

A.    Information from CW-1

16.    CW-1 advised in or about 2008 that the defendant SEBASTIANO SARACINO told CW-1 that the defendant wanted to evict the tenants so that he could earn money by renting the Property and that, to evict the Property's tenants, the defendant SEBASTIANO SARACINO had the main water line to the residence cut, which resulted in sewage backing up in the Property.

17.    CW-1 also advised that the defendant SEBASTIANO SARACINO also told CW-1 that the defendant could earn more money by setting the building on fire and fraudulently filing an insurance claim to recoup the damages.

18.    In addition, CW-1 advised that the defendant SEBASTIANO SARACINO recruited CW-1 and several others to set fire to the residence.  CW-1 further advised that when he entered the

8

Property, he observed sewage.  CW-1 further advised that the defendant SEBASTIANO SARACINO and CW-1, together with others, poured gasoline on the first and second floors of the Property and then lit several matches.

B.   Information from CW-2

19.   CW-2 advised in or about 2008 that the defendant SEBASTIANO SARACINO asked CW-2 to set fire to the Property, but CW-2 declined.

20.   CW-2 further advised that a coconspirator "CC-1," who at the time was Colombo family associate, told CW-2 that CC-1, and others, participated in setting fire to the Property.

C.   Other Evidence

21.   Property records reveal that, on or about August 20, 1993, the defendant SEBASTIANO SARACINO purchased the Property, a two-story residence adjacent to a property owned by CC-1.

22.   Police records reveal that, on or about August 9, 1996, officers responded to the Property where a fire had been reported.  Firefighters determined that the fire originated in the basement and that vapors of a flammable liquid had been introduced thereto.  Based on the above, the fire was determined to be intentionally set.

9

23.     Following the fire, the defendant SEBASTIANO
SARACINO, in a statement to NYPD officers, advised that he had
leased out the Property to tenants, but that the lease expired on
July 31, 1996, and that he did not intend to renew the lease due
to domestic issues between the tenants.

24.     Records obtained from the National Insurance
Crime Bureau reveal that the defendant SEBASTIANO SARACINO
submitted an insurance claim on or about August 12, 1996 to Blue
Ridge Insurance Company, located at 1 General Drive, Sun Prairie,
Wisconsin, for an estimated $75,000 loss caused by fire.

II.  <u>Bank Burglary</u>

25.     As further described below, in the early- to
mid-1990s, the defendant SEBASTIANO SARACINO, together with
others, attempted to burglarize a bank on Long Island, New York
(hereinafter, the "Bank"), in violation of Title 18, United
States Code, Section 2113(a) (Attempted Bank Burglary), and New
York Penal Law 140.20 (Burglary in the Third Degree), 140.25
(Burglary in the Second Degree) and 110.00 (Attempt).

26.     CW-1 advised in 2009 that in or about 1995,
CW-1 and the defendant SEBASTIANO SARACINO, together with others
including CC-1 and a coconspirator "CC-2," who were at the time
Colombo family associates, agreed to burglarize the night
depository box at the Bank.

10

27.    CW-1 advised that prior to the attempted burglary, one or more coconspirators built a three-wall structure out of plywood (hereinafter, the "Plywood Structure") and painted the Plywood Structure a color that resembled the wall on which the night depository box at the Bank was situated.

28.    CW-1 advised that on the night of the attempted burglary, the coconspirators brought to the Bank a blow torch and the Plywood Structure.  CW-1 further advised that, once at the Bank, the coconspirators placed the Plywood Structure in front of the night depository box to conceal their activities.

29.    CW-1 advised that the defendant SEBASTIANO SARACINO and CW-1 stood inside of the Plywood Structure (such that passers-by could not see the coconspirators' activities inside of the Plywood Structure) and attempted to access the money stored in the night depository box by using a blowtorch to melt the screws securing the night depository box to the wall of the Bank.

30.    CW-1 advised that, while the defendant SEBASTIANO SARACINO and CW-1 were attempting to access the night depository box, one of their coconspirators notified them via a handheld radio that they had to abort the attempted burglary because it appeared a security guard had become aware of the burglary attempt.  CW-1 further advised that the defendant

11

SEBASTIANO SARACINO and CW-1, together with others, then fled the area in their vehicles.

III. Disposal of Richard Greaves's Body

31. As further described below, the defendant SEBASTIANO SARACINO, together with others, assisted in disposing of the body of Richard Greaves ("Greaves") after Greaves was murdered by members and associates of the Colombo crime family as part of the affairs of that illegal enterprise, in violation of Title 18, United States Code, Sections 3 (Accessory After The Fact), 1959 (murder in aid of racketeering) and 2 (Aiding and Abetting), and New York Penal Law § 205.65 (Hindering Prosecution).

32. At the time of Greaves's murder, Greaves was an associate within the Colombo family and had participated in numerous crimes with other Colombo family associates including CC-1, CC-2 and CW-1.

33. Greaves was last seen on or about August 4, 1995; he has not been seen since and his body has never been recovered.[4]

---

[4] Based, in part, on CW-1's statements, the government obtained a search warrant to search the areas where CW-1 advised that he and others buried Greaves and two other bodies. On October 6, 2008, the FBI recovered one of those bodies in the area where CW-1 had advised it had been buried. The FBI has not yet recovered the bodies of Greaves or the other individual CW-1 advised he and others buried.

34.     An individual ("Individual") has advised, among
other things, that Individual was close to Greaves for
approximately two years until he disappeared in August 1995, and
that Individual knew some of Greaves's closest friends to include
CC-1, CC-2 and CW-1.  Public records reflect that on or about
August 5, 1995, Individual filed a missing person's report for
Richard Greaves.

A.    Information from CW-2

35.     CW-2 advised that Greaves was a criminal
associate of the Colombo family, and had close ties to CC-1, CC-2
and CW-1.  CW-2 further advised that at one point after Greaves
disappeared, CC-1, while intoxicated, told CW-2, "we did Richie
in the basement[,]" meaning that Greaves was murdered in CC-1's
basement.

36.     CW-2 advised that CC-1 lived at 1966 76th
Street, Brooklyn, New York from the early 1990s until his arrest
in June 2008.

B.    Florida Trip and Grand Jury Subpoena

37.     On or about May 5, 2008, CW-2 traveled with
CC-1 from Brooklyn, New York to South Florida.

38.     On or about May 6, 2008, FBI agents in
California attempted to serve a Grand Jury subpoena on the
defendant SEBASTIANO SARACINO at 27722 Crowne Point Court,
Salinas, California.  Later that afternoon, the agents left

13

messages on a voice mailbox to a telephone number associated with
27722 Crowne Point Court, Salinas, California.  On one of those
messages, the agent indicated that the agent was contacting the
defendant SEBASTIANO SARACINO regarding his involvement in
disposing of Greaves's body.

39.     CW-2 advised that on the afternoon of May 6,
2008, his wife, who was at the time in Brooklyn, New York, called
CW-2 on his cellular telephone and told him that CC-1's wife had
called her and indicated that there was trouble in California.
CW-2 understood that this pertained to SEBASTIANO SARACINO, who
lived in Salinas, California, and relayed the message to CC-1.

40.     CW-2, who was equipped with a recording device,
spent the evening of May 6, 2008 with CC-1 at the Hard Rock Hotel
and Casino in South Florida.  CW-2 advised that CC-1 contacted
the defendant SEBASTIANO SARACINO and that CC-1 later told CW-2
that CC-1 believed there must be an informant close to CC-1 and
others.  CW-2 advised that CC-1 speculated as to who might be
cooperating with law enforcement, naming CW-1, among others, as a
possible "rat."[5]  CW-2 further advised that CC-1 later started to
vomit repeatedly.  A review of a consensual recording made by
CW-2 on the evening of May 6, 2008 reveals that CC-1 stated,

---

[5]     CW-1 did not begin cooperating until later, in
September 2008.

14

"There's a big time informant. I can't figure it out."[6/]  The
consensual recording further reveals that CC-1 later started to
vomit.

41.     On or about May 7, 2008, CW-2, who was again
equipped with a recording device, spent the day with CC-1 at the
Hard Rock Hotel and Casino in South Florida.  A review of a
consensual recording made by CW-2 that day reveals that CC-1
stated, "We did it together, we go down together, we knew what we
were doing, we were young boys, we were young boys."

42.     On the evening of May 7, 2008, CW-2, who was
again equipped with a recording device, went to several bars with
CC-1.  CW-2 advised that late that night CC-1 accused him of
being a "rat" and patted him down in search of a recording
device.  CW-2 further advised that CW-2 then transferred the
recording device to his sock, thereby limiting the audibility of
the recording made that night.  CW-2 advised that at one point
during the night, CC-1 stated, in sum and substance, "I've shot
people.  I've killed people.  I've cut people up."

     C.  Information from CW-1

43.     CW-1 advised the following in regard to the
Greaves murder:

               a.  In or about August 1995, CW-1, CC-1 and
          CC-2 were at the time each associates of the Colombo

---

[6]     The quotations provided herein are based on draft
transcripts of the recordings and are subject to revision.

family and another coconspirator "CC-3" was an inducted member of the Colombo family.

b. CW-1, CC-1, CC-2 and CC-3 participated in the murder of Greaves. CW-1 was, in part, motivated by his belief that his participation in the murder would increase the probability that he would become an inducted member of the Colombo family.

c. On the day of Greaves's murder, Greaves was lured to 1966 76th Street, Brooklyn, New York, where CC-1 and the defendant SEBASTIANO SARACINO lived at the time. While Greaves was in the basement of 1966 76th Street, Brooklyn, New York, CC-1 fatally shot him.

d. Following the murder of Greaves, CC-2 told CW-1, in sum and substance, that they would need a licensed driver to transport Greaves's body to its burial site.

e. CW-1 later dug a hole in Farmingdale, New York, in which to bury Greaves's body. After CW-1 dug the hole, CC-1 arrived in a Jeep Wrangler at the location where CW-1 had dug the hole. CW-1 recognized the Jeep Wrangler belonging to the defendant SEBASTIANO SARACINO. CW-1 and CC-1 then retrieved Greaves's body from the trunk of the Jeep Wrangler and placed him in the hole that CW-1 had dug. That night, CC-1 told CW-1

16

that the defendant SEBASTIANO SARACINO and another coconspirator ("CC-4") drove Greaves's body in the Jeep Wrangler to Long Island.

      f.    After CW-1 and CC-1 buried Greaves's body, they drove the Jeep Wrangler to a nearby gas station, where CW-1 observed, among others, the defendant SEBASTIANO SARACINO, CC-2 and CC-4.  The defendant SEBASTIANO SARACINO then drove CW-1 and others in the Jeep Wrangler from Long Island to Brooklyn, New York.

30.    A search of New York Department of Motor Vehicle records reveals that in August 1995, the defendant SEBASTIANO SARACINO had a valid New York driver's license.  The search further revealed that in August 1995, CW-1, CC-1 and CC-2 did not have valid New York driver's licenses.

DEFENDANT'S IMMIGRATION STATUS

44.    The defendant SEBASTIANO SARACINO is a citizen of Italy.  SEBASTIANO SARACINO entered the United States as a lawful permanent resident on or about May 19, 1979 with his mother and father.

45.    On or about January 3, 2002, the defendant SEBASTIANO SARACINO submitted, via U.S. Mail, a Form N-400, Application for Naturalization, with the Department of Justice, Immigration and Naturalization Service ("INS"), the predecessor

17

to ICE. On that form, the defendant SEBASTIANO SARACINO listed his address, under penalty of perjury, as 1966 76th Street, Brooklyn, New York. On that form, SEBASTIANO SARACINO also claimed, under penalty of perjury, that he had never knowingly committed any crime for which he had not been arrested and that he was not a member in or affiliated with any organization, association, club, society.

46.     The envelope in which the Form N-400, Application for Naturalization, was transmitted to the INS was post-marked January 3, 2002 from Brooklyn, New York 11256.

47.     On or about April 22, 2004, the INS sent the defendant SEBASTIANO SARACINO a request to appear for fingerprinting in connection with the defendant's application for naturalization. The defendant SEBASTIANO SARACINO failed to appear as requested in the 87-day period beginning May 20, 2004. Accordingly, on or about July 28, 2005, INS notified the defendant SEBASTIANO SARACINO that it had deemed the defendant's application abandoned for failure to comply with the request for an appearance to be fingerprinted.

48.     I am advised by representatives of CIS that had the defendant SEBASTIANO SARACINO admitted that he had committed any or all of the crimes set forth above or that he was affiliated with the Colombo family, CIS would not have granted

the defendant SEBASTIANO SARACINO's application for
naturalization if he had pursued the application.

49.    Because public filing of this document could
result in a risk of flight by the defendant, as well as
jeopardize the government's investigation, your deponent
respectfully requests that the complaint and arrest warrant be
filed under seal.

WHEREFORE, your deponent respectfully requests that an
arrest warrant be issued for the defendant SEBASTIANO SARACINO,
also known as "Sebby" and "Sebastian Saracino," so that he may be
dealt with according to law.

Dated:    Brooklyn, New York
          February 5, 2010

                              FRANK IERVASI
                              Special Agent
                              Immigration and Customs Enforcement

Sworn
5th day

THE HON                    D
UNITED                     DGE
EASTERN DISTRICT OF NEW YORK

19